## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| **DEBRA DARLENE HAMMOCK,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CV 04-B-2318-S** |
| | ) | |
| **B E L L S O U T H   T E L E C O M -** | ) | |
| **MUNICATIONS, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### <u>MEMORANDUM OPINION</u>[1]

This case is presently pending before the court on plaintiff's Motion for Partial Summary Judgment, (doc. 22); defendant's Cross Motion for Partial Summary Judgment, (doc. 27); plaintiff's Motion for Summary Judgment, (doc. 38); and defendant's Motion for Summary Judgment, (doc. 52).  Plaintiff Debra Darlene Hammock has sued defendant BellSouth Telecommunications, alleging that defendant wrongfully denied her claim for short-term disability benefits and long-term disability benefits.  Upon consideration of the record, the submissions of the parties, the arguments of counsel, and the relevant law, the court is of the opinion that plaintiff's Motion for Partial Summary Judgment, (doc. 22), and defendant's Cross Motion for Partial Summary Judgment, (doc. 27), are due to be denied as moot.  Defendant's Motion for Summary Judgment, (doc. 52), is due to be granted in part and

---

[1]At oral argument, the court informed counsel that it was granting defendant's Motion for Summary Judgment.  On further review of the record, the court has concluded that that decision was wrong as to plaintiff's claim for short-term disability benefits.

denied in part; plaintiff's Motion for Summary Judgment, (doc. 38), is due to be granted in part and denied in part.

## I.  STANDARD OF REVIEW

Pursuant to Fed. R. Civ. P. 56(c), summary judgment is appropriate when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party bears the initial burden of showing no genuine issue of material fact and that it is entitled to judgment as a matter of law.  *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and show that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Id.* at 249.  Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and, therefore, evidence favoring the non-moving party is to be believed and all justifiable inferences are to be drawn in her favor.  *See id.* at 255.  Nevertheless, the non-moving party need not be given the benefit of every

inference but only of every **reasonable** inference. *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## II.  <u>STATEMENT OF FACTS</u>

Plaintiff Debra Hammock was employed by defendant BellSouth Telecommunications, Inc. as a Sales Associate, which is a sedentary position. (Doc. 51 at 142, 701.)  Defendant maintains qualified ERISA plans for purposes of providing short-term disability [STD] benefits and long-term disability [LTD] benefits to qualified employees. Defendant is the named Plan Administrator; however, it delegated its "day-to-day responsibility for administering plan matters" to the Employees' Benefit Claim Review Committee ["EBCRC"].  (Doc. 24, Ex. 2 at 01452, 01462.)  The EBCRC, in turn, delegated its duties with regard to deciding claims for benefits to Kemper National Services.[2]  (*Id*. at 01462.)  According to the STD Plan Summary,

> Kemper is the named fiduciary under the plan with complete authority to review all denied claims for benefits in exercising such fiduciary responsibilities.  Kemper shall have discretionary authority to determine whether or to what extent participants are eligible for benefits and to construe disputed or doubtful plan terms.  Kemper shall be deemed to have properly exercised such authority unless they have abused their discretion hereunder by acting as arbitrarily and capriciously.

(*Id*.)

---

[2]Kemper National Services has changed its name to Broadspire Services, Inc.  (*See* doc. 29, Ex. 4 ¶ 2.)  For purposes of this Memorandum Opinion, the court will continue to refer to the claims administrator as Kemper.

Under the terms of the STD Plan, employees who have completed six months of service are Plan participants. (Doc. 24, Ex. 2 at 01448.) Plaintiff is a Plan participant. (*See* doc. 51 at 00144.) Subject to certain conditions, participants who become "disabled" are entitled to STD benefits for a period of up to 52 weeks. (Doc. 24, Ex. 2 at 01448.) If a participant is "disabled" for more than 52 weeks, the LTD Plan provides for LTD benefits. (*Id.*, Ex. 3 at 01471.) The definition of "disability" in the STD Plan is:

> "Disability" means a medical condition which makes a Participant unable to perform any type of work as a result of a physical or mental illness or an accidental injury. "Any type of work" includes the Participant's regular job with or without accommodations, any other Participating Company job (regardless of availability) with or without accommodations, or temporary modified duties. "A Participating Company job" is any job within a Participating Company, or any job outside a Participating Company which is comparable in skills and functions. A Participant subject to Disability is referred to as being "Disabled."

(*Id.*, Ex. 2 at 01447.)[3] A participant is considered disabled under the LTD Plan if she is unable to work because of a mental or physical illness and has received 52 weeks of STD benefits. (*Id.*, Ex. 3 at 01470.)

Plaintiff contends that she is disabled, and thus entitled to STD benefits, due to severe chronic headaches and migraine headaches; she also claims that she is entitled to LTD

---

[3]The court notes that Kemper described a different definition for "disability" than the one contained in the STD Plan in the record. (*Compare* doc. 24, Ex. 2 at 01447 *with* doc. 51 at 00318.) The Kemper definition, which it contends is contained in "Section 2 of the BellSouth Short-Term Disability plan," includes "treatment that qualifies as a Chemical Dependent Confinement" that is not contained in the STD Plan in the record.

4

benefits because more than 52 weeks have past since she became eligible for STD benefits. (Doc. 47 ¶¶ 9, 12-13.)

In May 2001, plaintiff consulted Robert Ford, M.D., who performed a thermogram that showed abnormalities consistent with migraine and abnormalities consistent with chronic headache. (Doc. 51 at 01223-24.) He diagnosed her with "migraine with aura," "chronic daily headache," and "drug rebound." (*Id*. at 01225.)

On March 16, 2002, plaintiff was admitted to Shelby Baptist Medical Center by Diane Counce, M.D. with a "severe intractable headache." (*Id*. at 00822.) Dr. Counce noted that plaintiff had the headache for four days before she was admitted to the hospital. (*Id*.) She said plaintiff's headache "was associated with severe nausea, photophobia and phonophobia," and vomiting. (*Id*.) The headache was not relieved by "regular anti-migraine medications," or "Sphenopalatine block, bilateral occipital nerve block, Imitrex injection and Toradol." *Id*.) Plaintiff was given Demoral, Phenergan, and Sol Medrol while hospitalized, with limited relief of her pain. (*Id*. at 00823.) She was discharged on March 22, 2002, and given a Medrol Dosepak, Lortab, and Valium. (*Id*.)

After her discharge from the hospital, plaintiff saw Dr. Ford. (*Id*. at 00831.) Dr. Ford said that plaintiff's "exam was essentially unremarkable except for prostration from severe headache." (*Id*.) He noted that her headache was refractory to treatment and that he had told plaintiff that he "had nothing really to offer her . . . and that she needed to be referred to another center such as Diamond Headache Clinic, Chicago." (*Id*.) Dr. Ford wrote plaintiff

a work excuse, keeping her out of work until further notice, and he wrote Kemper a letter recounting his diagnosis and referral.  (*Id*. at 00831, 00833.)

Plaintiff's initial visit to the Diamond Headache Clinic was on May 1, 2002.  (*Id*. at 00184.)  At that time, she was hospitalized and remained in the hospital until May 27, 2002.  (*Id*.)  Merle L. Diamond, M.D., treated plaintiff.  (*Id*.)  He noted that  plaintiff had chronic daily headaches; he wrote:

> The headaches are located frontal, retro-orbital and occipitally with neck involvement.  Her headaches have progressively increased in severity and intensity in past two years.  Associated symptoms are:  vertigo, nausea, vomiting, numbness, tingling, photophobia, and phonophobia. They have been occurring on a daily basis since two years ago.

(*Id*.)  Dr. Diamond concluded that plaintiff was "severely disabled as a result of her headaches," and "It is my professional opinion that due to the continued frequency, severity, and duration of the attacks and the associated symptoms she is unable to perform the duties of her present job."  (*Id*. at 00186.)

On June 11, 2002, plaintiff was allowed STD benefits for the period from May 1, 2002 through May 26, 2002, but Kemper denied her claim for STD benefits after May 27, 2002.  (*Id*. at 00719, 00730-31.)  On July 2, 2002, BellSouth terminated plaintiff "for unsatisfactory attendance." (Doc.  37, Ex. 35.)

On July 17, 2002, Gordon J. Kirschberg, M.D., a neurologist, examined plaintiff for Kemper as an Independent Medical Exam or "IME".  (Doc. 51 at 00188-91.)  His report stated:

6

Thank you for referring this . . . lady to me for evaluation of severe chronic headaches which she has had for the last two years. . . . For the past two years she has had chronic daily headaches and they really involve three types. The one that is every day is left and right occipital and neck radiating up to the vertex and bifrontal area with some nausea, blurred vision and phono and photophobia. The second type occurs about every two weeks. It is severe, retro orbital and poking feeling. This lasts a couple of days. The third is a vertex sharp pain such as an ice pick, but it can occur anywhere in the head to the forehead. [It] last three to four days, occurring about once a week. She has been seen by Dr Ford and Dr. Diamond. She has had a variety of daily medications, along with abortive medications. Currently she is on Limbitrol, hydrocortisone, Synthroid and Vivactil, along with Depakote. She was on Nimotop and this was stopped. Her abortives include Soma, Vestoril, Axert, Haldol, Cogentin and Valium. She has been more frequently been [sic] switched to Thorazine and Benadryl.

. . .

IMPRESSION:

This lady has severe chronic daily headaches. She does not have any definite organic neurological objective abnormalities. She does tend to walk slowly as if she is somewhat weak, but can do heel to toe walking and has no weakness to manual muscle testing, so that the most I can say on a semi-objective basis is that she is fatigued and generally weak, but not truly neurologically or muscularly weak. In addition the weakness, if truly objective, would be more related to her Addison's disease than her neurological condition.

Therefore, from a purely objective point of view neurologically, there is no abnormality to be found.

(*Id*. at 00188-89.)

On August 1, 2002, Vaughn Cohan, M.D., a neurologist employed by Kemper, determined that the Kirschberg IME did not support disability; he set forth his rationale as follows:

The claimant is a 43 year old female employed as a sale associate for BellSouth. This is a sedentary occupation. She has a long history of intermittent headache dating back to age 16. Her headaches are described as both migraine and analgesic related rebound headache. She has also been treated by a psychiatrist for chronic depression and panic attacks. She went out of work 3/14/02 with recurrence of headaches on a daily basis and has not returned to work subsequently. She has been in the care of several neurologists and has been treated appropriately with a variety of analgesic and anti-migraine preparations and has had unsatisfactory results from appropriate prophylactic and rescue medication. However, all her treating physicians have found her to have normal general medical and neurologic physical examinations and her EEG and brain MRI studies were also normal. An independent medical evaluation was performed 7/17/02 by [Dr. Kirschberg], who also found her to have normal neurologic examination and also submitted an estimated evaluation of physical abilities form which stated the claimant could lift up to 20 lbs. in an eight hour day and had no restrictions or limitations with respect to pushing/pulling, carrying, reaching or working above shoulder level, walking, standing, sitting, stooping, kneeling, repeat bending, climbing, operating [an] automobile, or vision.

Based on my review of the medical records there is no objective evidence of a functional impairment, which would preclude this claimant from performing sedentary work.

(*Id*. at 00192-93.)

On August 17, 2002, plaintiff was hospitalized again by Dr. Diamond for treatment of status migraine. (*Id*. at 00199.) In September 2002, Dr. Diamond wrote a letter to Kemper stating:

Due to the continued severity, frequency, and duration of her headaches, it is my professional opinion that [plaintiff] is unable to sustain any gainful employment at this present time. Additionally she is on several medications for headache, which causes [sic] drowsiness and dizziness, and therefore affects [sic] her ability to function at any type job. The length of this disability is expected to last up to three months.

(*Id*. at 00199.)

8

Kemper referred plaintiff to Roland Rivard, M.D., for an IME to estimate functional abilities.  (*Id*. at 00205.)   Dr. Rivard specifically limited his opinion to plaintiff's musculoskeletal system, and specifically excluded consideration of her headaches on her ability to work. (*Id*. at 00205-06.) He found, from a musculoskeletal point of view, plaintiff had some mild impairments that did not prevent her from performing sedentary work.  (*Id*.) He noted that plaintiff did "not show[ ] any indication of symptom magnification," and that "she appear[ed] to be a straightforward person." (*Id*. at 00205.)  He gave plaintiff three tests to determine if she was malingering or exaggerating her symptoms:  Waddell's Non-Organic Signs, Beck Inventory Questionnaire, and Life Impact Assessment.  (*Id*. at 00297.)  As a result of these tests, Dr. Rivard found "no indication of symptom magnification" or that plaintiff was "anticipating or receiving financial compensation." (*Id*.)

On November 13, 2002, Eddie Sassoon, M.D., a physiatrist employed by Kemper, reviewed Rivard's functional capacity evaluation ["FCE"] and he concluded that the Rivard FCE did not indicate an inability to work.  (*Id*. at 00221-24.)

Dr. Kirschberg performed another neurological IME on November 5, 2002.  (*Id*. at 00217.) He also reviewed Dr. Rivard's report and records from Dr. Diamond.  (*Id*. at 00217-18.)  Based on his review of the record and his examination, he reported:

> Again, from an objective organic neurological point of view this patient has no signs or findings.  She has severe chronic complaints of daily headache which are incapacitating to her, but these are subjective complaints.  Dr. Rivard's FCE is pretty much close to the FCE I completed . . . and I agree completely with his FCE evaluation.

9

(*Id*. at 00218.)

On November 26, 2002, Dr. Cohan reviewed the IMEs from Dr. Rivard and Dr. Kirschberg.  (*Id*. at 00225-26.)  He concluded "[t]here [was] no objective evidence of a functional impairment which would preclude the claimant from performing sedentary work. As before, I find no evidence of disability from 03/21/02 based upon neurologic and/or musculoskeletal considerations.  (*Id*. at 00226.)

Plaintiff was found disabled by the Social Security Administration and awarded benefits beginning September 2002.  (*Id*. at 00268.)  Kemper received a copy of the Social Security Administration's decision.  (*Id*.)

Plaintiff was hospitalized again by Dr. Diamond from January 31, 2003 to February 12, 2003, with "migraine without aura, [and] acute confusion."  (*Id*. at 00231.)  The Discharge Summary indicates that plaintiff reported a "daily severe headache for the past two weeks," with nausea, photophobia, and phonophobia."  (*Id*.)  Plaintiff was treated with Norflex, Thorazine, Benadryl, and DHE.[4]  (*Id*.)  She was discharged in stable condition.  (*Id*. at 00234.)

On March 27, 2003, Dr. Kirschberg performed another IME.  (*See id*. at 00236-39.) He noted, "The patient's headaches continue to be chronic and daily about once or twice a week. [sic]  They are severe with nausea and vomiting but they are almost always in the

---

[4]DHE is Dihydroergotamine mesylate and is used in the treatment of severe migraine headache.  American Academy of Neurology, *Use of DHE in Migraine*, found at <<http://www.aan.com/professionals/patient/hakit/pdf/use_of_dhe.pdf>>.

occiput, sometimes bifrontal, sometimes zetro orbital but certainly nothing related to a focal migraine kind of syndrome or cluster headache which is what she tells me her headaches have been called."  (*Id*. at 236.)   He stated that he could not find a "definite objective abnormality in this lady."  (*Id*. at 00237.)

Thereafter, Dr. Cohan again reviewed this Kirschberg IME.  (*Id*. at 00240.)  He found the IME did not support a finding that plaintiff was disabled.  (*Id*.)  He stated, "The newly submitted information does not reveal any significant changes in the claimant's objective physical findings or work functionality when compared with the previous investigation."  (*Id*.)

In May 2003, Dr. Cohan notes that he "was asked to perform a peer-to-peer telephonic conference with [Dr. Diamond]."  (*Id*. at 00242.)  He left two messages for Dr. Diamond, but Dr. Diamond did not return Dr. Cohan's calls.  (*Id*.)  Dr. Cohan reviewed additional medical records, which he does not identify in his report, and he found that the additional medical records did not "demonstrate objective evidence of a functional impairment which would preclude [plaintiff] from performing the essential elements of her own sedentary occupation or "any sedentary occupation."  (*Id*. at 00243.)

Kemper sent plaintiff to Dr. Kirschberg for another IME on June 5, 2003.  (*Id*. at 00244.)  Dr. Kirschberg noted that plaintiff had "chronic severe headaches," and that "[s]he continue[d] to have one or two headaches per week."  (*Id*.)  He stated:

> She goes intermittently to the Diamond Headache Clinic where she gets a variety of medications and continues to have the same number of headaches

11

before, during and after treatment as she has for the last several years.  There are no specific physical abnormalities.  I see no difference in her situation now as compared to several months ago.  I think there is a great deal of psycho social input into this problem and from a purely objective neurological point of view there is no reason why the patient can't work an eight hour sedentary job *if she did not [have] a headache* and since she only has one or two headaches a week this would seem to indicate that she could work five or six days a week.

I do not know what the Diamond Headache Clinic said in her last admission there and would very much like those records so I can comment on how my feeling[s] correspond to theirs, they being the treating physicians.

Her husband told me today that every time they go to the hospital she receives disability income.  When she comes out she is "sent here" and her checks are then cut off.  This would seem to indicate that there is a vicious cycle going on here which would indicate a good deal of psycho social difficulty and I think it would be in everybody's best interest to try and settle this and avoid the prolongation of this cyclic behavior.

(*Id*. at 00244 (emphasis added).)

On July 21, 2003, Guendalina Ravello, Ph.D. reported the results of a "comprehensive psychological evaluation (mental status; intellectual assessment and malingering scale)" to Kemper.  (*Id*. at 00247.)  She diagnosed plaintiff with dysthymia with recurrent major depressive episodes; major depression, recurrent, moderate, and exacerbated by plaintiff's medical condition; anxiety disorder (NOS) with panic attacks and post-traumatic stress symptoms; and personality disorder (NOS) with dependent traits. (*Id*. at 00252.) She graded plaintiff's Global Assessment of Functioning at 65 and estimated her GAF was 60 prior to

leaving work.[5]  (*Id*. at 00257.)  She found that test results demonstrated plaintiff was not exaggerating or feigning her difficulties.  (*Id*. at 00252.)

Kemper's psychologist, Lawrence Burstein, Ph.D., reviewed Dr. Ravello's evaluation on July 28, 2003.  (*Id*. at 00258.)  He stated, "There are no indicators of impairments that would preclude Ms. Hammock from working at all, from a psychological perspective;" therefore, he found, "[I]t does not appear that Ms. Hammock is suffering from impairments in psychological functioning which would preclude her from performing work at this time." (*Id*. at 00259.)

On August 5, 2003, Kemper denied plaintiff's claim for STD benefits.  (*Id*. at 00318.) In its denial letter, Kemper stated:

> Upon review of your file, it has been determined that you do not qualify for Short-Term Disability benefits.  Pursuant to BellSouth's Short Term Disability Plan, Section 5.2 objective data that supports your inability to work any job within the company must be received in order to be eligible for benefits.  ... There were no indicators of impairments that would preclude you from performing any type of work.  Therefore, effective 6/20/03 your short term disability benefits are denied, retroactively.

(*Id*. at 00318-19 (original emphasis omitted).)

Plaintiff appealed this decision; the decision was upheld on September 10, 2003.  (*Id*. at 00175.)  Kemper denied plaintiff's first-level appeal on the ground that plaintiff's doctors

---

[5]"The GAF scale is . . . for reporting the clinician's judgment of the individual's overall level of functioning."  *Nowlen v. Commissioner of Social Sec.*, 277 F. Supp. 2d 718, 726 (E.D. Mich. 2003)(internal quotations and citations omitted). A score of 70-61 indicates mild symptoms and a score of 51-60 indicates moderate symptoms.  *Id*.

had "not given [Kemper] sufficient objective, medical data to support [her] being 'disabled' from any type of work." (*Id*. at 00176.)   Plaintiff filed a second-level appeal. (*See id*. at 00163.)

In support of her appeal, plaintiff submitted a letter from Dr. Diamond, dated February 19, 2004; Dr. Diamond stated that he believed plaintiff was "suffering from Chronic Headache and Duragesic rebound." (*Id*. at 00151, 00153.)  He also stated that plaintiff had no premonitory symptoms. (*Id*. at 00152.)  His prognosis for plaintiff was "poor." (*Id*. at 00154.)  He said, "Due to the frequency, severity, and duration of her headaches and despite aggressive medical therapy including several inpatient admissions, the debilitating nature of these headaches and associated symptoms prevent her from any gainful employment." (*Id*.)

On April 9, 2004, Kemper denied plaintiff's second-level appeal. (*Id*. at 00146.)  It denied plaintiff's claim based on the fact that "[t]he medical information provided [did] not support [plaintiff'] being 'disabled' from any type of work." (*Id*.)

## III. DISCUSSION

### A. SHORT-TERM DISABILITY

The Eleventh Circuit has established a "multi-step approach" for "reviewing virtually all ERISA-plan benefit denials." *Williams v. BellSouth Telecommunications, Inc.*, 373 F.3d 1132, 1137 (11th Cir. 2004).  The six steps of the review are:

> (1) Apply the de novo standard to determine whether the claim administrator's benefits-denial decision is "wrong" ( i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

14

(2)  If the administrator's decision in fact is "de novo wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

(3)  If the administrator's decision is "de novo wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

(4)  If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

(5)  If there is no conflict, then end the inquiry and affirm the decision.

(6)  If there is a conflict of interest, then apply heightened arbitrary and capricious review to the decision to affirm or deny it.

*Id.* at 1138-39.

## 1.  DE NOVO REVIEW OF THE CLAIMS ADMINISTRATOR'S DECISION

Defendant denied plaintiff's claim for benefits based on a lack of objective medical evidence.  In its letter to plaintiff denying her claim for STD benefits, defendant wrote, "Pursuant to BellSouth's Short Term Disability Plan, Section 5.2 objective data support[ing] your inability to work any job within the company must be received in order to be eligible for benefits."  (Doc. 51 at 00318.)  However, Section 5.2 of the STD plan does not explicitly or implicitly require the submission of "objective data;" it is merely the time limit for filing a claim.  (Doc. 24, Ex. 2 at 01450.)  Section 5.2 states, "All claims for Benefits must be made within 60 days from the first day of absence on account of sickness or injury, or within 60 days of receipt of formal notice of suspended or unapproved benefits . . . ."  (*Id.*)  Therefore,

contrary to Kemper's letter to plaintiff, Section 5.2 of the STD plan does not require objective data of disability.

Moreover, the court notes that there is objective evidence that indicates plaintiff is suffering chronic headaches and migraines – the thermogram performed by Dr. Ford, the psychological tests that revealed plaintiff was neither feigning nor exaggerating her symptoms, and treatment records.[6]  Therefore, the court finds that defendant's determination that plaintiff did not provide objective medical evidence is also wrong.

_____

[6]The court also notes that plaintiff has received medical treatment, including hospitalization, for her headaches.  Such evidence of medical treatment is consistent with plaintiff's complaints of headache pain.  *See Carradine v. Barnhart,* 360 F.3d 751, 755 (7th Cir. 2004).  Circuit Judge Richard Posner, writing for the Seventh Circuit Court of Appeals, recognized the relevancy of evidence of medical treatment; he stated:

> [I]t . . . appears that the doctors accepted the claimant's complaints at face value and proceeded to treat her in the absence of significant findings upon diagnostic testing and physical examination.  Since severe pain is consistent with the absence of significant findings upon diagnostic testing and physical examination, which would not reveal a psychological origin of pain, the doctors had no choice but to take [claimant's] complaints of pain at face value and treat her.  What is significant is the improbability that [claimant] would have undergone the pain-treatment procedures that she did . . . merely in order to strengthen the credibility of her complaints of pain and so increase her chances of obtaining disability benefits; likewise the improbability that she is a good enough actress to fool a host of doctors and emergency-room personnel into thinking she suffers extreme pain; and the (perhaps lesser) improbability that this host of medical workers would prescribe drugs and other treatment for her if they thought she were faking her symptoms.  Such an inference would amount to an accusation that the medical workers who treated [the claimant] were behaving unprofessionally.

*Id.* (internal quotations and citations omitted).

Reviewing the entire administrative record, the court finds that, for the period of time for which plaintiff seeks STD benefits, she was disabled by severe chronic headaches and migraine headaches which prevented her from working.

In its Memorandum in Opposition to Plaintiff's Motion for Summary Judgment and in Support if Defendant's Cross-Motion for Summary Judgment, defendant contends, "Dr. Kirschberg [noted] that Plaintiff reported headaches at most one to two days per week, thereby leaving her free to work the other days."  (Doc. 53 at 12 (citing doc, 51 at 00244).) Dr. Kirschberg said, "I think there is a great deal of psycho social input into this problem and from a purely objective neurological point of view there is no reason why the patient can't work an eight hour sedentary job if she did not [have] a headache and since she only has one or two headaches a week this would seem to indicate that she could work five or six days a week." (Doc. 51 at 00244.)  The record contains evidence that plaintiff cannot predict when she is going to have a headache, and, certainly, nothing in the record indicates that she would actually plan to have a headache on an off day.  The court has no evidence that plaintiff could or could not perform any work if she was going to be incapacitated one or two days each week on an unpredictable basis.  However, the court will not assume that there is sedentary work available that plaintiff can perform that does not require regular and predictable attendance.[7]

_____

[7]The court notes that, typically, two or more absences a month preclude employment. *See Thompson v. Barnhart*, 382 F. Supp. 2d 740, 748 (E.D. Pa. 2005)("The VE also testified that there would be no work Plaintiff could perform in the local economy if he were unable

The court finds that plaintiff has established that she suffers severe chronic headaches one or two days per week.  For purposes of discussion, the court assumes that the severity, frequency, and unpredictability of plaintiff's headaches prevent her working.  Therefore, the court finds that defendant's decision to deny plaintiff STD benefits was wrong.

### 2.  ADMINISTRATOR'S DISCRETION IN REVIEWING CLAIMS

Kemper, the plan administrator, has discretion in reviewing claims.  (Doc. 29, Ex. 6, ex. G at 7; *id*., ex. H at  7-9.)

### 3.  "REASONABLE" GROUNDS FOR THE DECISION

"Normally, a decision to deny benefits is arbitrary and capricious if no reasonable basis exists for the decision."  *Levinson v. Reliance Standard Life Ins. Co.*, 245 F.3d 1321, 1325-26 (11th Cir. 2001)(quoting *Shannon v. Jack Eckerd Corp.*, 113 F.3d 208, 210 (11th Cir. 1997))(internal quotations omitted).  After review of defendant's grounds for denying plaintiff's claim for STD, the court finds that these grounds are not reasonable.[8]

#### a.  Plan requires objective evidence.

---

to work, due to increased pain, when it rained, as increased pain due to damp weather would likely cause two or more absences in a month in this region, and those absences would likely result in Plaintiff's termination."); *Giles v. Barnhart*, 368 F. Supp. 2d 924, 940 (N.D. Iowa 2005)("When questioned by the ALJ, the vocational expert testified that two or more absences per month and two or more breaks during the work day on an unscheduled basis for about a half an hour would preclude competitive employment for [claimant].")

[8]This conclusion differs from the one the court expressed at oral argument, but a more thorough review of the medical evidence submitted to Kemper supports the court's current decision.

As set forth above, the Plan does not require objective evidence of inability to work. Indeed, the section cited by Kemper in its letter to plaintiff is nothing more than a clause defining the time limits for filing a claim. Therefore, rejection of plaintiff's claim because the Plan requires objective evidence was arbitrary and capricious.

**b. No evidence of an objective neurologic abnormality.**

The lack of an objective neurologic cause for plaintiff's headaches is not a reasonable basis for finding that plaintiff does not have headaches. Nothing in the record supports a finding that lack of a "neurological" cause means that plaintiff is not having severe headaches as lack of a neurological cause does not rule out other causes for the headaches. Also, nothing in the record supports a finding that plaintiff is not having severe incapacitating headaches at least one to two days per week. Indeed, the record supports the finding that plaintiff is actually having severe chronic headaches. A finding to the contrary is arbitrary and capricious.

**c. Physical capabilities**

Plaintiff has made no claim that she does not have the physical functional capacity to perform sedentary work. Her STD claim is based on her headache pain. Therefore, whether she can physically sit, stand, lift, and carry is irrelevant to the determination of whether she is disabled due to headaches. A finding that plaintiff is not disabled because she has the physical functional capacity to perform sedentary work is arbitrary and capricious.

19

The court finds that no reasonable basis exists for Kemper's decision to deny plaintiff's claim for STD benefits. Therefore defendant's Motion for Summary Judgment is due to be denied as to plaintiff's claim for STD benefits, and plaintiff's Motion for Summary Judgment is due to be granted.

Because the court finds that defendant's decision to deny benefits was arbitrary and capricious, the court need not decide the parties' Motions for Partial Summary Judgment, which concern whether defendant's claims decision is to be reviewed under the arbitrary and capricious standard or a heightened arbitrary and capricious standard. Therefore, plaintiff's Motion for Partial Summary Judgment and defendant's Cross Motion for Partial Summary Judgment are due to be denied as moot.[9]

------------------------------------------------

[9]However, the court notes that the Eleventh Circuit Court of Appeals held that the *language* of the contract between Kemper and BellSouth was sufficient to create a conflict of interest and, thus, trigger the heightened review of the claims decision. The court held:

> Turning to the BellSouth/Kemper contract, we note that it plainly spells out the scope of Kemper's independence and discretion and, more importantly, the extent of BellSouth's retained control. . . . One provision states that "Kemper shall adjudicate all Plan claims and appeals in accordance with written claim review procedures provided by [BellSouth]." Williams argues that this gives BellSouth control over how Kemper disposes of claims, and thus it is no different than BellSouth processing the claims itself since Kemper is using the same guidelines and procedures that BellSouth employed before delegating its claims duties to Kemper. But there is a difference between giving general instructions applicable to the adjudication of all claims and *having actual control over the disposition of specific claims*. *Buce* [*v. Allianz Life Ins. Co.*, 247 F.3d 1141 (11th Cir. 2001)] requires application of the heightened arbitrary and capricious standard only with the latter.

> . . .

20

The court declines to award plaintiff STD benefits and will remand this case to the

administrator for consideration of plaintiff's STD benefits claim in light of the foregoing.[10]

---

But the BellSouth-Kemper contract also provides that, "[w]here specific instructions as to a particular matter have been given [by BellSouth], Kemper is charged with strict compliance with such instructions, no matter how broad its general powers may otherwise have been." ***This provision, plainly construed, grants BellSouth the power to give Kemper specific instructions as to specific claims, which Kemper then must unquestioningly follow***.

Furthermore, nothing appears to limit BellSouth's ability to give any instruction it wants, including the instruction to grant or deny a claim. This means that BellSouth has the same ability as the administrator in *Buce* to control any aspect of the disposition of claims it chooses.

Yet, there is a notable distinction. While the administrator in *Buce* expressly claimed the power to dispose of specific claims for itself, BellSouth has only expressly claimed the right to tell Kemper how to dispose of claims. Technically, then, BellSouth escapes *Buce's* reasoning, since it does not have the ability to deny claims itself.

***Still, that technical distinction does not change the ultimate truth– BellSouth nevertheless holds the ultimate power to do with claims as it wants; it just has to tell Kemper when to do it. As such, the conflict between BellSouth's fiduciary and profit-making interest, which triggers the heightened standard of review, remains***. *See Buce*, 247 F.3d at 1141.

*Williams v. BellSouth Telecommunications, Inc.*, 373 F.3d 1132, 1136-37 (11th Cir. 2004)(original emphasis deleted and emphasis added).

The court informed counsel during oral argument that it strongly believes if the Eleventh Circuit was privy to all the evidence submitted to the court in this case, it might very well find the correct standard of review to be the arbitrary and capricious standard.

[10]Remand to the administrator is appropriate in this case because the administrator failed to state adequate grounds to support its decision and the evidence of record does not compel a finding in favor of plaintiff. *See Buffonge v. Prudential Ins. Co. of America*, 426 F.3d 20, 31-32 (1st Cir. 2005); *Caldwell v. Life Ins. Co. of North America*, 287 F.3d 1276, 1288-89 (10th Cir. 2002); *Levinson v. Reliance Standard Life Ins. Co.,* 245 F.3d 1321 (11th

Specifically, the Administrator shall determine whether, despite a lack of neurological abnormality, plaintiff actually suffers from debilitating chronic headaches.  If so, the administrator shall determine the severity, frequency, and predictability of such headaches and whether plaintiff's headaches prevent her from working.

## B.  LONG TERM DISABILITY BENEFITS

Plaintiff seeks long term disability [LTD] benefits in addition to her claim for STD benefits.  Pursuant to the terms of the Plan, plaintiff is not entitled to LTD benefits unless and until she exhausts 52 weeks of STD benefits.  (Doc. 24, Ex. 3 at 1447.)  Because plaintiff was denied STD benefits, she has not exhausted her STD benefits and, thus, is not qualified for LTD benefits.  Plaintiff's Motion for Summary as to her claim for LTD benefits is due to be denied; defendant's Motion for Summary Judgment as to plaintiff's claim for LTD benefits is due to be granted and such claim is due to be dismissed.

## CONCLUSION

For the foregoing reasons, the court is of the opinion that plaintiff's Motion for Summary Judgment, (doc. 38), is due to be granted in part and denied in part, and defendant's Motion for Summary Judgment, (doc. 52), is due to be granted in part and denied in part.  The court finds that plaintiff is entitled to judgment as a matter law as to her claim for STD benefits; her Motion for Summary Judgment, (doc. 38), is due to granted as to this claim and defendant's Motion for Summary Judgment, (doc. 52), is due to be denied.

Cir. 2001); *Gallo v. Amoco Corp.*, 102 F.3d 918, 923 (7th Cir. 1996).

22

However, the court finds that defendant is entitled to judgment as a matter of law as to plaintiff's claim for LTD benefits.  Therefore, plaintiff's Motion for Summary Judgment, (doc. 38) is due to be denied as to this claim, and defendant's Motion for Summary Judgment, (doc. 52), is due to be granted.  Plaintiff's claim for LTD benefits will be dismissed.

For the reasons set forth above, the court finds that plaintiff's Motion for Partial Summary Judgment, (doc. 22), and defendant's Cross Motion for Partial Summary Judgment, (doc. 27), are due to be dismissed as moot.

An Order in conformity with this Memorandum Opinion will be entered contemporaneously.

**DONE**, this 31st day of March, 2006.


SHARON  LOVELACE  BLACKBURN
UNITED STATES DISTRICT JUDGE