## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **DEBRA DARLENE HAMMOCK,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CASE NO.  CV 04-B-2318-S** |
| | ) | |
| **B E L L S O U T H   T E L E C O M -** | ) | |
| **MUNICATIONS, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

This case is presently pending before the court on plaintiff's Motion for Summary Judgment, (doc. 73), and defendant's Motion for Summary Judgment, (doc. 75).  Plaintiff Debra Darlene Hammock has sued defendant BellSouth Telecommunications, alleging that defendant wrongfully denied her claim for short-term disability ["STD"] benefits and long-term disability benefits.  This court found that defendant's decision to deny plaintiff's claim for STD benefits was arbitrary and capricious and it remanded this case to the administrator for reconsideration in light of the court's opinion.  This case is again before the court on the parties' cross-motions for summary judgment.  Upon consideration of the record, the submissions of the parties, the arguments of counsel, and the relevant law, the court is of the opinion that plaintiff's Motion for Summary Judgment, (doc. 73), is due to be granted, and defendant's Motion for Summary Judgment, (doc. 75), is due to be denied.

# I. <u>STANDARD OF REVIEW</u>

Pursuant to Fed. R. Civ. P. 56(c), summary judgment is appropriate when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of showing no genuine issue of material fact and that she is entitled to judgment as a matter of law. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Once the moving party has met her burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and show that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. Determining credibility, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and, therefore, evidence favoring the non-moving party is to be believed and all justifiable inferences are to be drawn in its favor. *See id.* at 255. Nevertheless, the non-moving party need not be given the benefit of every inference but only of every ***reasonable*** inference. *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## II. **STATEMENT OF FACTS**

The court made the following factual findings in its prior opinion:

Plaintiff Debra Hammock was employed by defendant BellSouth Telecommunications, Inc. as a Sales Associate, which is a sedentary position. (Doc. 51 at 142, 701.)  Defendant maintains qualified ERISA plans for purposes of providing short-term disability [STD] benefits and long-term disability [LTD] benefits to qualified employees. Defendant is the named Plan Administrator; however, it delegated its "day-to-day responsibility for administering plan matters" to the Employees' Benefit Claim Review Committee ["EBCRC"]. (Doc. 24, Ex. 2 at 01452, 01462.) The EBCRC, in turn, delegated its duties with regard to deciding claims for benefits to Kemper National Services. (*Id*. at 01462.)  According to the STD Plan Summary,

> Kemper is the named fiduciary under the plan with complete authority to review all denied claims for benefits in exercising such fiduciary responsibilities. Kemper shall have discretionary authority to determine whether or to what extent participants are eligible for benefits and to construe disputed or doubtful plan terms.  Kemper shall be deemed to have properly exercised such authority unless they have abused their discretion hereunder by acting as arbitrarily and capriciously.

(*Id*.)

Under the terms of the STD Plan, employees who have completed six months of service are Plan participants. (Doc. 24, Ex. 2 at 01448.)  Plaintiff is a Plan participant. (*See* doc. 51 at 00144.)  Subject to certain conditions, participants who become "disabled" are entitled to STD benefits for a period of up to 52 weeks. (Doc. 24, Ex. 2 at 01448.) If a participant is "disabled" for more than 52 weeks, the LTD Plan provides for LTD benefits. (*Id*., Ex. 3 at 01471.)  The definition of "disability" in the STD Plan is:

> "Disability" means a medical condition which makes a Participant unable to perform any type of work as a result of a physical or mental illness or an accidental injury.  "Any type of work" includes the Participant's regular job with or without accommodations, any other Participating Company job (regardless of availability) with or without accommodations, or temporary modified duties.  "A Participating Company job" is any job within a Participating Company, or any job

3

outside a Participating Company which is comparable in skills and functions. A Participant subject to Disability is referred to as being "Disabled."

(*Id.*, Ex. 2 at 01447.) A participant is considered disabled under the LTD Plan if she is unable to work because of a mental or physical illness and has received 52 weeks of STD benefits. (*Id.*, Ex. 3 at 01470.)

Plaintiff contends that she is disabled, and thus entitled to STD benefits, due to severe chronic headaches and migraine headaches; she also claims that she is entitled to LTD benefits because more than 52 weeks have past since she became eligible for STD benefits. (Doc. 47 ¶¶ 9, 12-13.)

In May 2001, plaintiff consulted Robert Ford, M.D., who performed a thermogram that showed abnormalities consistent with migraine and abnormalities consistent with chronic headache. (Doc. 51 at 01223-24.) He diagnosed her with "migraine with aura," "chronic daily headache," and "drug rebound." (*Id.* at 01225.)

On March 16, 2002, plaintiff was admitted to Shelby Baptist Medical Center by Diane Counce, M.D. with a "severe intractable headache." (*Id.* at 00822.) Dr. Counce noted that plaintiff had the headache for four days before she was admitted to the hospital. (*Id.*) She said plaintiff's headache "was associated with severe nausea, photophobia and phonophobia," and vomiting. (*Id.*) The headache was not relieved by "regular anti-migraine medications," or "Sphenopalatine block, bilateral occipital nerve block, Imitrex injection and Toradol." (*Id.*) Plaintiff was given Demoral, Phenergan, and Sol Medrol while hospitalized, with limited relief of her pain. (*Id.* at 00823.) She was discharged on March 22, 2002, and given a Medrol Dosepak, Lortab, and Valium. (*Id.*)

After her discharge from the hospital, plaintiff saw Dr. Ford. (*Id.* at 00831.) Dr. Ford said that plaintiff's "exam was essentially unremarkable except for prostration from severe headache." (*Id.*) He noted that her headache was refractory to treatment and that he had told plaintiff that he "had nothing really to offer her . . . and that she needed to be referred to another center such as Diamond Headache Clinic, Chicago." (*Id.*) Dr. Ford wrote plaintiff a work excuse, keeping her out of work until further notice, and he wrote Kemper a letter recounting his diagnosis and referral. (*Id.* at 00831, 00833.)

4

Plaintiff's initial visit to the Diamond Headache Clinic was on May 1, 2002. (*Id*. at 00184.)  At that time, she was hospitalized and remained in the hospital until May 27, 2002. (*Id*.)  Merle L. Diamond, M.D., treated plaintiff. (*Id*.)  He noted that plaintiff had chronic daily headaches; he wrote:

> The headaches are located frontal, retro-orbital and occipitally with neck involvement.  Her headaches have progressively increased in severity and intensity in past two years.  Associated symptoms are: vertigo, nausea, vomiting, numbness, tingling, photophobia, and phonophobia.  They have been occurring on a daily basis since two years ago.

(*Id*.)  Dr. Diamond concluded that plaintiff was "severely disabled as a result of her headaches," and "It is my professional opinion that due to the continued frequency, severity, and duration of the attacks and the associated symptoms she is unable to perform the duties of her present job."  (*Id*. at 00186.)

On June 11, 2002, plaintiff was allowed STD benefits for the period from May 1, 2002 through May 26, 2002, but Kemper denied her claim for STD benefits after May 27, 2002.  (*Id*. at 00719, 00730-31.)  On July 2, 2002, BellSouth terminated plaintiff "for unsatisfactory attendance."  (Doc. 37, Ex. 35.)

On July 17, 2002, Gordon J. Kirschberg, M.D., a neurologist, examined plaintiff for Kemper as an Independent Medical Exam or "IME".  (Doc. 51 at 00188-91.)  His report stated:

> Thank you for referring this . . . lady to me for evaluation of severe chronic headaches which she has had for the last two years. . . .  For the past two years she has had chronic daily headaches and they really involve three types.  The one that is every day is left and right occipital and neck radiating up to the vertex and bifrontal area with some nausea, blurred vision and phono and photophobia.  The second type occurs about every two weeks.  It is severe, retro orbital and poking feeling.  This lasts a couple of days.  The third is a vertex sharp pain such as an ice pick, but it can occur anywhere in the head to the forehead. [It] last three to four days, occurring about once a week.  She has been seen by Dr Ford and Dr. Diamond.  She has had a variety of daily medications, along with abortive medications.  Currently she is on Limbitrol, hydrocortisone, Synthroid and Vivactil, along with Depakote.  She was

on Nimotop and this was stopped.  Her abortives include Soma, Vestoril, Axert, Haldol, Cogentin and Valium.  She has been more frequently been [sic] switched to Thorazine and Benadryl.

. . .

IMPRESSION:

This lady has severe chronic daily headaches.  She does not have any definite organic neurological objective abnormalities.  She does tend to walk slowly as if she is somewhat weak, but can do heel to toe walking and has no weakness to manual muscle testing, so that the most I can say on a semi-objective basis is that she is fatigued and generally weak, but not truly neurologically or muscularly weak.  In addition the weakness, if truly objective, would be more related to her Addison's disease than her neurological condition.

Therefore, from a purely objective point of view neurologically, there is no abnormality to be found.

(*Id*. at 00188-89.)

On August 1, 2002, Vaughn Cohan, M.D., a neurologist employed by Kemper, determined that the Kirschberg IME did not support disability; he set forth his rationale as follows:

The claimant is a 43 year old female employed as a sale associate for BellSouth.  This is a sedentary occupation.  She has a long history of intermittent headache dating back to age 16.  Her headaches are described as both migraine and analgesic related rebound headache.  She has also been treated by a psychiatrist for chronic depression and panic attacks.  She went out of work 3/14/02 with recurrence of headaches on a daily basis and has not returned to work subsequently.  She has been in the care of several neurologists and has been treated appropriately with a variety of analgesic and anti-migraine preparations and has had unsatisfactory results from appropriate prophylactic and rescue medication.  However, all her treating physicians have found her to have normal general medical and neurologic physical examinations and her EEG and brain MRI studies were also normal.  An independent medical evaluation was performed 7/17/02 by [Dr. Kirschberg], who

6

also found her to have normal neurologic examination and also submitted an estimated evaluation of physical abilities form which stated the claimant could lift up to 20 lbs. in an eight hour day and had no restrictions or limitations with respect to pushing/pulling, carrying, reaching or working above shoulder level, walking, standing, sitting, stooping, kneeling, repeat bending, climbing, operating [an] automobile, or vision.

Based on my review of the medical records there is no objective evidence of a functional impairment, which would preclude this claimant from performing sedentary work.

(*Id*. at 00192-93.)

On August 17, 2002, plaintiff was hospitalized again by Dr. Diamond for treatment of status migraine. (*Id*. at 00199.) In September 2002, Dr. Diamond wrote a letter to Kemper stating:

Due to the continued severity, frequency, and duration of her headaches, it is my professional opinion that [plaintiff] is unable to sustain any gainful employment at this present time. Additionally she is on several medications for headache, which causes [sic] drowsiness and dizziness, and therefore affects [sic] her ability to function at any type job. The length of this disability is expected to last up to three months.

(*Id*. at 00199.)

Kemper referred plaintiff to Roland Rivard, M.D., for an IME to estimate functional abilities. (*Id*. at 00205.) Dr. Rivard specifically limited his opinion to plaintiff's musculoskeletal system, and specifically excluded consideration of her headaches on her ability to work. (*Id*. at 00205-06.) He found, from a musculoskeletal point of view, plaintiff had some mild impairments that did not prevent her from performing sedentary work. (*Id*.) He noted that plaintiff did "not show[ ] any indication of symptom magnification," and that "she appear[ed] to be a straightforward person." (*Id*. at 00205.) He gave plaintiff three tests to determine if she was malingering or exaggerating her symptoms: Waddell's Non-Organic Signs, Beck Inventory Questionnaire, and Life Impact Assessment. (*Id*. at 00297.) As a result of

these tests, Dr. Rivard found "no indication of symptom magnification" or that plaintiff was "anticipating or receiving financial compensation." (*Id*.)

On November 13, 2002, Eddie Sassoon, M.D., a physiatrist employed by Kemper, reviewed Rivard's functional capacity evaluation ["FCE"] and he concluded that the Rivard FCE did not indicate an inability to work. (*Id*. at 00221-24.)

Dr. Kirschberg performed another neurological IME on November 5, 2002. (*Id*. at 00217.) He also reviewed Dr. Rivard's report and records from Dr. Diamond. (*Id*. at 00217-18.) Based on his review of the record and his examination, he reported:

> Again, from an objective organic neurological point of view this patient has no signs or findings. She has severe chronic complaints of daily headache which are incapacitating to her, but these are subjective complaints. Dr. Rivard's FCE is pretty much close to the FCE I completed . . . and I agree completely with his FCE evaluation.

(*Id*. at 00218.)

On November 26, 2002, Dr. Cohan reviewed the IMEs from Dr. Rivard and Dr. Kirschberg. (*Id*. at 00225-26.) He concluded "[t]here [was] no objective evidence of a functional impairment which would preclude the claimant from performing sedentary work. As before, I find no evidence of disability from 03/21/02 based upon neurologic and/or musculoskeletal considerations. (*Id*. at 00226.)

Plaintiff was found disabled by the Social Security Administration and awarded benefits beginning September 2002. (*Id*. at 00268.) Kemper received a copy of the Social Security Administration's decision. (*Id*.)

Plaintiff was hospitalized again by Dr. Diamond from January 31, 2003 to February 12, 2003, with "migraine without aura, [and] acute confusion." (*Id*. at 00231.) The Discharge Summary indicates that plaintiff reported a "daily severe headache for the past two weeks," with nausea, photophobia, and phonophobia." (*Id*.) Plaintiff was treated with Norflex, Thorazine, Benadryl, and DHE. (*Id*.) She was discharged in stable condition. (*Id*. at 00234.)

On March 27, 2003, Dr. Kirschberg performed another IME. (*See id*. at 00236-39.) He noted, "The patient's headaches continue to be chronic and daily about once or twice a week. [sic]  They are severe with nausea and vomiting but they are almost always in the occiput, sometimes bifrontal, sometimes zetro orbital but certainly nothing related to a focal migraine kind of syndrome or cluster headache which is what she tells me her headaches have been called." (*Id*. at 236.) He stated that he could not find a "definite objective abnormality in this lady." (*Id*. at 00237.)

Thereafter, Dr. Cohan again reviewed this Kirschberg IME. (*Id*. at 00240.)  He found the IME did not support a finding that plaintiff was disabled. (*Id*.) He stated, "The newly submitted information does not reveal any significant changes in the claimant's objective physical findings or work functionality when compared with the previous investigation." (*Id*.)

In May 2003, Dr. Cohan notes that he "was asked to perform a peer-to-peer telephonic conference with [Dr. Diamond]." (*Id*. at 00242.) He left two messages for Dr. Diamond, but Dr. Diamond did not return Dr. Cohan's calls. (*Id*.) Dr. Cohan reviewed additional medical records, which he does not identify in his report, and he found that the additional medical records did not "demonstrate objective evidence of a functional impairment which would preclude [plaintiff] from performing the essential elements of her own sedentary occupation or "any sedentary occupation." (*Id*. at 00243.)

Kemper sent plaintiff to Dr. Kirschberg for another IME on June 5, 2003. (*Id*. at 00244.)  Dr. Kirschberg noted that plaintiff had "chronic severe headaches," and that "[s]he continue[d] to have one or two headaches per week." (*Id*.)  He stated:

> She goes intermittently to the Diamond Headache Clinic where she gets a variety of medications and continues to have the same number of headaches before, during and after treatment as she has for the last several years.  There are no specific physical abnormalities.  I see no difference in her situation now as compared to several months ago.  I think there is a great deal of psycho social input into this problem and from a purely objective neurological point of view there is no reason why the patient can't work an eight hour sedentary job ***if she did not [have] a headache*** and since she only has one or two headaches a week this would seem to indicate that she could work five or six days a week.

I do not know what the Diamond Headache Clinic said in her last admission there and would very much like those records so I can comment on how my feeling[s] correspond to theirs, they being the treating physicians.

Her husband told me today that every time they go to the hospital she receives disability income. When she comes out she is "sent here" and her checks are then cut off. This would seem to indicate that there is a vicious cycle going on here which would indicate a good deal of psycho social difficulty and I think it would be in everybody's best interest to try and settle this and avoid the prolongation of this cyclic behavior.

(*Id*. at 00244 (emphasis added).)

On July 21, 2003, Guendalina Ravello, Ph.D. reported the results of a "comprehensive psychological evaluation (mental status; intellectual assessment and malingering scale)" to Kemper. (*Id*. at 00247.) She diagnosed plaintiff with dysthymia with recurrent major depressive episodes; major depression, recurrent, moderate, and exacerbated by plaintiff's medical condition; anxiety disorder (NOS) with panic attacks and post-traumatic stress symptoms; and personality disorder (NOS) with dependent traits. (*Id*. at 00252.) She graded plaintiff's Global Assessment of Functioning at 65 and estimated her GAF was 60 prior to leaving work. (*Id*. at 00257.) She found that test results demonstrated plaintiff was not exaggerating or feigning her difficulties. (*Id*. at 00252.)

Kemper's psychologist, Lawrence Burstein, Ph.D., reviewed Dr. Ravello's evaluation on July 28, 2003. (*Id*. at 00258.) He stated, "There are no indicators of impairments that would preclude Ms. Hammock from working at all, from a psychological perspective;" therefore, he found, "[I]t does not appear that Ms. Hammock is suffering from impairments in psychological functioning which would preclude her from performing work at this time." (*Id*. at 00259.)

On August 5, 2003, Kemper denied plaintiff's claim for STD benefits. (*Id*. at 00318.) In its denial letter, Kemper stated:

Upon review of your file, it has been determined that you do not qualify for Short-Term Disability benefits. Pursuant to BellSouth's Short Term

10

Disability Plan, Section 5.2 objective data that supports your inability to work any job within the company must be received in order to be eligible for benefits. . . .

There were no indicators of impairments that would preclude you from performing any type of work.  Therefore, effective 6/20/03 your short term disability benefits are denied, retroactively.

(*Id*. at 00318-19 (original emphasis omitted).)

Plaintiff appealed this decision; the decision was upheld on September 10, 2003.  (*Id*. at 00175.)  Kemper denied plaintiff's first-level appeal on the ground that plaintiff's doctors had "not given [Kemper] sufficient objective, medical data to support [her] being 'disabled' from any type of work."  (*Id*. at 00176.)  Plaintiff filed a second-level appeal.  (*See id*. at 00163.)

In support of her appeal, plaintiff submitted a letter from Dr. Diamond, dated February 19, 2004; Dr. Diamond stated that he believed plaintiff was "suffering from Chronic Headache and Duragesic rebound."  (*Id*. at 00151, 00153.)  He also stated that plaintiff had no premonitory symptoms.  (*Id*. at 00152.)  His prognosis for plaintiff was "poor."  (*Id*. at 00154.)  He said, "Due to the frequency, severity, and duration of her headaches and despite aggressive medical therapy including several inpatient admissions, the debilitating nature of these headaches and associated symptoms prevent her from any gainful employment."  (*Id*.)

On April 9, 2004, Kemper denied plaintiff's second-level appeal.  (*Id*. at 00146.)  It denied plaintiff's claim based on the fact that "[t]he medical information provided [did] not support [plaintiff'] being 'disabled' from any type of work."  (*Id*.)

(Doc. 55 at 3-14 [footnotes omitted].)

The court found that the record before the administrator proved plaintiff was entitled to STD benefits and, therefore, defendant's decision denying benefits was wrong.  (Doc. 55 at 17-18.)  Moreover, the court found defendant's decision was arbitrary and capricious.  (*Id*. at 18-20.)  The court remanded the matter to defendant, stating:

The court declines to award plaintiff STD benefits and will remand this case to the administrator for consideration of plaintiff's STD benefits claim in light of the foregoing.  Specifically, the Administrator shall determine whether, despite a lack of neurological abnormality, plaintiff actually suffers from debilitating chronic headaches.  If so, the administrator shall determine the severity, frequency, and predictability of such headaches and whether plaintiff's headaches prevent her from working.

(*Id.* at 21-22 [footnote omitted])

On remand, Henry Spira, a neurologist, reviewed the file for defendant and determined:

The claimant is a 48-year-old woman, who is being evaluated for a functional impairment on the above noted dates for any occupation.  She has had headaches since age 16.  It has been diagnosed as both migraines and medication rebound headaches.  She has had normal electroencephalograms and MRIs in the past.  She has failed on multiple medications.

An Independent Medical Examination was performed by Dr. Kirschberg on 11/5/2002 and the neurological examination was completely within normal limits objectively.

A neurological examination performed by Dr. Rivard and on 11/24/2002, was an objective normal neurological examination.

A Functional Capacity Evaluation performed in 11/2002 reported that she should be able to do at least sedentary work.

Dr. Kirschberg saw the claimant again in 3/2003.  At that time her Mini-Mental Status Examination was normal.  Her objective neurological examination was within normal limits.  ***He stated that the claimant should be able to work an eight-hour day at a sedentary job***.

The claimant has been followed at the Diamond Headache Clinic and the notes were reviewed.  She was admitted on 8/17/2002 through 8/21/2002 for parenteral[1] medication.

The claimant has been having one to two headaches per week with nausea and vomiting as stated by the claimant.

During the dates in question, there are no records submitted of any hospitalization. No parenteral medications were given in the physician's office or in the emergency department.  There is no record of intractable[2] nausea or vomiting that would cause dehydration or the need for intravenous fluids.

1) The claimant has chronic headaches with normal neurological examinations as mentioned above.  It would be difficult to classify her chronic headaches as debilitating where no parenteral medications are given.  There are no hospitalizations and no intractable nausea and vomiting.

2)  As mentioned above, the claimant at best has one or two headaches per week, sometimes they are daily.  It is impossible to predict the frequency of her headaches.  However, the severity of the headaches as mentioned above should be taken into account as to the fact that despite the supposedly severe headache she was having, no parenteral medication, intravenous fluid, or hospitalizations were necessary.

3)  The headaches that the claimant was having on a daily basis at times, sometimes once or twice a week did not [require] any parenteral medication at the physician's office, no treatment for intractable nausea and vomiting with intravenous fluids and no hospitalization.  Therefore, it should not have prevented the claimant from working.

The opinion above is based on the information provided for review, rendered in the context of the evidence-based medicine guidelines applicable and/or

---

[1]"Parenteral" means "situated or occurring outside the intestine" such as "parenteral drug administration by intravenous, intramuscular, or subcutaneous injection."  *See* "Parenteral," found at <<http://medical.merriam-webster.com/medical/parenteral>>.

[2]"Intractable" means "not easily managed or controlled (as by antibiotics or psychotherapy)."   "Intractable" found at <<http://medical.merriam-webster.com/medical/intractable>>.

relevant to the specific circumstances of this, and held to a reasonable degree
of clinical certainty.

(Doc. 72-2 at BST 01749-51 [footnotes and emphasis added].)  Dr. Spira's opinion does not

discuss this court's prior findings or the evidence upon which those findings were made.

Defendant did not inform plaintiff that her claim for STD benefits had been denied

on remand.  However, on September 18, 2006, Aetna, formerly Broadspire Services, sent this

court an unauthenticated memorandum that stated:

> On 6/19/06, an Aetna medical consultant, Dr. Spira, performed a case review
> and determined that the claimant's headaches did not prevent her from
> performing some type of work, her headaches would not be classified as
> debilitating when no parenteral medications were prescribed and severity of
> the headaches should be taken into account as to the fact that she did not
> receive parenteral medication, intravenous fluid or hospitalization.
>
> Again, Ms. Debra Darlene Hammock has exhausted all her appeal rights and
> her case has undergone an additional case review on 6/19/06.

(Doc. 62, Ex. A.)

Noting that an administrator's failure to act is deemed a denial of her claim, this court

restored this case to its docket on March 31, 2008.  (Doc. 68.)

## III.  DISCUSSION

The Eleventh Circuit has established a multi-step approach for reviewing virtually all

ERISA-plan benefit denials" *Doyle v. Liberty Life Assur. Co.*, 542 F.3d 1352, 1356-57 (11th

Cir. 2008)(citing *Williams v. BellSouth Telecommunications, Inc.*, 373 F.3d 1132, 1137 (11th

Cir. 2004), *overruled in part Metro. Life Ins. Co. v. Glenn*, 128 S. Ct. 2343 (2008)).  These

steps of the review are:

14

(1) Apply the de novo standard to determine whether the claim administrator's benefits-denial decision is "wrong" ( i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

(2) If the administrator's decision in fact is "de novo wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

(3) If the administrator's decision is "de novo wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported the decision. This determination includes consideration of whether the administrator had a conflict of interest.

(4) If the administrator's decision was not supported by reasonable grounds, reverse the administrator's decision; if reasonable grounds do exist, affirm the administrator's decision.

*Id.* at 1356-57, 1360.[3]

─────────────

[3]The Eleventh Circuit had established a six-step analysis for evaluating all ERISA decisions. However, "the Supreme Court's intervening decision in *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. ----, 128 S.Ct. 2343, 171 L.Ed.2d 299 (2008), implicitly overruled this rubric 'to the extent it requires district courts to review benefit determinations by a conflicted administrator under the heightened standard.'" *Creel v. Wachovia Corp*, No. 08-10961, 2009 WL 179584, *6 (11th Cir. Jan. 27, 2009)(citing *Doyle*, 542 F.3d at 1360).

*Glenn* affects only the sixth step in this scheme by making the existence of a conflict of interest a factor in the ERISA analysis, rather than the impetus for applying a heightened arbitrary and capricious standard. [Note] Accordingly, if there is a conflict of interest, a court should treat it as a factor in considering whether an administrator's benefits decision was arbitrary and capricious. Additionally, the burden is on the plaintiff to show the existence of such a conflict, not on the defendant to disprove its influence.

[Note:  Of course, Glenn would also affect the wording of the third step because there would be a single level of arbitrary and capricious review and thus no need to term it a "more deferential" arbitrary and capricious standard. This "arbitrary and capricious" review would look at whether the administrator

**STEP 1:  DE NOVO REVIEW**

For the reasons set forth in the court's prior opinion, which remain unchallenged by Dr. Spira's most-recent peer review, the court finds that defendant's decision to deny plaintiff's claim for STD benefits was wrong.

**STEP 2:  ADMINISTRATOR DISCRETION**

The plan administrator has discretion in reviewing claims.  (Doc. 55 at 18 [citing doc. 29, Ex. 6, ex. G at 7; *id*., ex. H at  7-9].) However, the administrative record indicates that defendant never informed plaintiff that her claim had been denied on remand.  "In some circuits other than the Eleventh, a de novo standard of review has been applied to situations formerly known as 'deemed denied' claims for [disability] benefits. Still other circuits refuse to apply any standard higher than deferential."  *Coates v. Guardian Life Ins. Co. of America*, No. 8:07-cv-291-T-26TBM, 2008 WL 269133, 2 and nn. 7 and 8 (M.D. Fla. Jan. 30, 2008)(citing, *inter alia*, *Nichols v. Prudential Ins. Co.,* 406 F.3d 98, 109 (2d Cir. 2005)(holding that de novo review applies to "deemed denial"); *Jebian v. Hewlett-Packard Co. Employee, Benefits Org. Inc. Prot. Plan*, 349 F.3d 1098, 1103 (9th Cir. 2003)(same), *cert. denied*, 545 U.S. 1139 (2005); *Gilbertson v. Allied Signal, Inc.*, 328 F.3d 625, 631 (10th Cir. 2003)(same); *McGarrah v. Hartford Life Ins. Co.*, 234 F.3d 1026, 1031 (8th Cir.

---

abused his discretion, whereas "heightened arbitrary and capricious" review would have applied a level of scrutiny in between abuse of discretion and de novo review.

*Creel*, 2009 WL 179584 at *6 and n.18.

2000)(holding deferential review applied despite "serious procedural errors"); *Southern Farm Bureau Life Ins. Co. v. Moore*, 993 F.2d 98, 101 (5th Cir. 1993)(court does not apply de novo review to "deem denied" case); *Daniel v. Eaton Corp*., 839 F.2d 263, 267 (6th Cir. 1988)(same)).  "[T]he Eleventh Circuit has not yet decided whether review of a deemed denial should be de novo."  *Id*. (citing *Torres v. Pittston Co.*, 346 F.3d 1324, 1332-33 (11th Cir. 2003)).  However, the failure of defendant to deny benefits in this case "constitutes a constructive denial best suited for a de novo review."  *Id*.

The court finds that defendant never exercised its discretion to deny plaintiff's claim on remand because it never actually decided to deny her claim as required by the regulations.  *See* 29 C.F.R. § 2560.503-1(f), (g), (i), (j).  Because defendant did not exercise its discretion to deny the claim, the claim is reviewed de novo.  As set forth above, under de novo review, plaintiff is entitled to STD benefits.

However, plaintiff does not advocate de novo review.  Indeed, plaintiff directs the court to Aetna's memorandum addressed to the court as evidence of defendant's decision to deny plaintiff's claim.  (Doc. 74 at 2 [citing doc. 62, Ex. A].)  Assuming that such document represents defendant's decision, and its exercise of its discretion, the court will review the decision under the arbitrary and capricious standard.

## STEP 3:  ARBITRARY AND CAPRICIOUS STANDARD – THE EXISTENCE OF "REASONABLE" GROUNDS SUPPORTING DEFENDANT'S DECISION

"The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of [defendant].  Nevertheless, [defendant] must

17

examine the relevant data and articulate a satisfactory explanation for its [decision] including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Manufacturers Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.* 463 U.S. 29, 43 (1983)(citing *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). An ERISA defendant "[n]ormally . . . would be arbitrary and capricious if [it] has relied on factors [that the Plan] has not intended it to consider, entirely failed to consider . . . important [evidence], offered an explanation for its decision that runs counter to the evidence before [it], or is so implausible that it could not be ascribed to a difference in view or the product of [its] expertise." *Id.* An ERISA defendant acts arbitrarily and capriciously when it "rel[ies] on [a] flawed peer review as a basis for denying [plaintiff's] benefits claim" and "fail[s] to review relevant medical evidence that support[s] [plaintiff's] claim." *See Oliver v. Coca-Cola Company*, 497 F.3d 1181, 1199 (11th Cir.), *vacated in non-pertinent part* 506 F.3d 1316 (11th Cir. 2007).

Defendant acted arbitrarily and capriciously in denying plaintiff's claim for STD benefits. Dr. Spira found that plaintiff was not prevented from working due to her headaches because she did not require parenteral pain medicine and did not require hospitalization for intractable vomiting and nausea. His review does not discuss Dr. Kirschberg's finding that plaintiff was not capable of working on the one-two days a week that she had a headache, the undisputed evidence from a number of sources that plaintiff was not malingering or magnifying her symptoms, evidence that plaintiff was prescribed a number of powerful

medicines (even though the medicines were not given intravenously), evidence that plaintiff was hospitalized three times with intractable headaches, and evidence from a number of treating and examining sources that supported plaintiff's claim. Indeed, Dr. Spira apparently did not consider any evidence that this court had found in its prior opinion that supported plaintiff's claim for STD benefits. *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003)("Plan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician.").

Moreover, the court finds that Dr. Spira's opinion that plaintiff is not having debilitating headaches does not follow logically from the only two facts he cites in support of his opinion – no evidence of parenteral medicine and no evidence of intractable nausea and vomiting. Plaintiff has never contended that her headaches were omnipresent. She alleges debilitating headaches one-two days a week, during which she has nausea with vomiting, photophobia and phonophobia. Nothing in the record indicates that nausea and vomiting continue after the headache eases. Therefore, the court does not presume an expectation of hospitalization for dehydration caused by a day or partial day spent nauseated and vomiting. Likewise, the court cannot presume that plaintiff's headaches were not severe simply because she did not receive pain medication through an injection or an intravenous drip. Plaintiff was prescribed some parenteral medication and other oral medications. However, plaintiff's treating physician found her headaches were refractory, or resistant, to treatment.

19

Dr. Spira's finding that plaintiff does not suffer debilitating headaches does not follow logically from his findings, only partially supporting by his reading of the record, that plaintiff did not take parenteral medicines or require hospitalization for nausea and vomiting. Therefore, the court finds that his determination that plaintiff's headaches were not debilitating was arbitrary and capricious. *See Oliver*, 497 F.3d at 1196-1200; " *Levinson v. Reliance Standard Life Ins. Co.*, 245 F.3d 1321, 1327 (11th Cir. 2001); *see also Hawkins v. First Union Corporation Long-Term Disability Plan*, 326 F.3d 914, 918 (7th Cir. 2003)(finding administrator's decision to deny benefits would be correct if there was "a logical incompatibility between [administrator's finding that plaintiff had previously worked full time] and being disabled from working full time, but there is not").

Based on the foregoing, the court finds that the decision to deny plaintiff's claim for STD benefits, assuming defendant actually so decided, was arbitrary and capricious.

## STEP 4:  IF NO REASONABLE GROUNDS EXIST, THEN END THE INQUIRY AND REVERSE THE ADMINISTRATOR'S DECISION

Because the court finds that no reasonable ground existed for defendant's decision to deny plaintiff's claim, the court's inquiry ends. *See Williams*, 373 F.3d at 1138.  Also, the court finds that this case is not appropriate for a second remand and it will award plaintiff STD benefits.

## <u>CONCLUSION</u>

For the foregoing reasons, the court is of the opinion that plaintiff's Motion for Summary Judgment is due to be granted and defendant's Motion for Summary Judgment is

due to be denied.  The court finds that plaintiff is entitled to judgment as a matter law as to

her claim for STD benefits.  By separate Order, the court will allow defendant an opportunity

to contest the amount of STD benefits plaintiff claims.[4]  Also, the court will allow the parties

time to resolve the amount of attorney's fees.  Following resolution of these issues, the court

will enter Judgment for plaintiff on her claim for STD benefits.

      **DONE**, this 31st day of March, 2009.


_Sharon Lovelace Blackburn_
SHARON  LOVELACE  BLACKBURN
CHIEF UNITED STATES DISTRICT JUDGE

---

[4]Defendant did not respond to plaintiff's calculation of her damages.  (*See* doc. 79.)